```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA      )
                                   )
 4        v.                       )  Docket No. 5:22-cr-00252-XR-1
                                   )
 5   MARK RYAN HAUSER,             )  San Antonio, Texas
                                   )  May 27, 2022
 6        Defendant.               )
     _____)
 7

 8        TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
          BEFORE THE HONORABLE ELIZABETH S. CHESTNEY
 9            UNITED STATES MAGISTRATE JUDGE

     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:
11   Kelly Griffith Stephenson
     United States Attorney's Office
12   601 NW Loop 410, Suite 6600
     San Antonio, TX 78216
13
     FOR THE DEFENDANT:
14   Molly Lizbeth Roth
     Federal Public Defender's Office
15   727 E. Cesar E. Chavez Blvd., Room B-207
     San Antonio, TX 78206-1205
16
     COURT RECORDER:  FTR Gold
17
     Proceedings reported by electronic sound recording.  Transcript
18   produced by computer-aided transcription.

19

20

21

22

23

24

25
```

1              INDEX

2                                          PAGE

3  JUSTIN GRANBERRY

4  Direct Examination by Mr. Stephenson ......................6

5  Cross-Examination by Ms. Roth ...........................14

6  Redirect Examination by Mr. Stephenson ..................16

7  DEENA HAUSER LANCASTER

8  Direct Examination by Ms. Roth ..........................18

9  Cross-Examination by Mr. Stephenson .....................26

10 Redirect Examination by Ms. Roth .......................31

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      (11:20 a.m.)
 2            THE COURT:  You may be seated.
 3            THE CLERK:  United States of America v. Mark Ryan
 4   Hauser, SA:22-CR-252.
 5            THE COURT:  Good morning.  I'll have appearances,
 6   please.
 7            MR. STEPHENSON:  Good afternoon, Your Honor.  Kelly
 8   Stephenson on behalf of the United States.
 9            MS. ROTH:  Good morning, Your Honor.  Molly Roth for
10   Mark Hauser.
11            THE COURT:  Good morning.
12      And I know there was a little bit of confusion.  I think at
13   the initial appearance Mr. Hauser indicated that he was being
14   represented by a different attorney, who was representing him
15   on state court cases, and we didn't connect that there was
16   another federal case pending here, and you're representing him
17   on that.  So we got that all squared away.  I apologize for the
18   confusion to the agent, too, coming back and forth.
19      Ms. Roth, are we proceeding today on both the arraignment
20   and detention hearing?
21            MS. ROTH:  We are, Your Honor.  Now, I don't represent
22   him on his other federal case.
23            THE COURT:  Oh, you don't.
24            MS. ROTH:  I don't.  But we are happy to represent him
25   on this case.  And the attorney on the other case advised that
```

1    he will not be representing Mr. Hauser on this case.

2            THE COURT:  Okay.  And so for cleanliness of the

3    record, we should probably just go ahead and -- did you have

4    him do a financial before this?

5            MS. ROTH:  I believe that Ms. Sandoval found that

6    there was a financial --

7            THE COURT:  There was a financial in the other case?

8            MS. ROTH:  Yes.

9            THE COURT:  Okay.  All right.  And just, if you could

10   confirm that.  And if there's not a complete one with them,

11   then file it at some point after the hearing today.

12           MS. ROTH:  Yes, Your Honor.

13           THE COURT:  Okay.  In terms of the arraignment,

14   Mr. Stephenson, I'll start by just reminding the government of

15   its disclosure obligations under *Brady v. Maryland* and the

16   consequences of what can happen if you violate any of those

17   disclosure obligations.  Those can include, but aren't

18   necessarily limited to, the delay of trial or other

19   proceedings, the exclusion of evidence, giving adverse jury

20   instructions, the charges being dismissed, among other things.

21   Thank you.

22      Mr. Hauser, I'm going to go ahead and ask my deputy to put

23   you under oath for this arraignment.

24           THE CLERK:  Please remain seated and raise your right

25   hand, please.

1    *(The oath was administered)*

2         THE CLERK:  Thank you.

3         THE COURT:  Ms. Roth, do you have any doubt as to your

4    client's competence today?

5         MS. ROTH:  No, Your Honor.

6         THE COURT:  And, Mr. Hauser, is there anything

7    interfering with your ability to understand me today?

8         THE DEFENDANT:  No, ma'am, Your Honor.

9         THE COURT:  All right.  And have you received a copy

10   of the indictment filed in this case?  It's a single count

11   indictment.

12        THE DEFENDANT:  I have, Your Honor.

13        THE COURT:  Okay.  And, Ms. Roth, does your client

14   waive my reading that to him again?

15        MS. ROTH:  He does.

16        THE COURT:  All right.  And would you like to enter a

17   plea on behalf of your client?

18        MS. ROTH:  Not guilty.

19        THE COURT:  All right.  A plea of not guilty will be

20   entered, and the case will be forwarded to the district court

21   for further proceedings.

22    I'll proceed now to the detention hearing portion of this

23   proceeding.  I will, of course, take judicial notice of the

24   indictment and that a grand jury found probable cause on the

25   charged offense.  And I have the pretrial services report as

Justin Granberry - Direct

1   well.

2       And then is the government going to be calling any

3   witnesses on the matter of detention?

4           MR. STEPHENSON:  Yes, Your Honor.  Government will

5   call Agent Justin Granberry.

6           THE COURT:  Okay.  You can come forward.

7           THE CLERK:  Please raise your right hand, please.

8       *(The oath was administered)*

9           MR. STEPHENSON:  Thank you.

10          JUSTIN GRANBERRY, GOVERNMENT'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. STEPHENSON:

13  Q.  Agent Granberry, can you please provide your name for the

14  record.

15  A.  My name's Justin Granberry.

16  Q.  And how are you employed?

17  A.  I'm employed with Homeland Security, and I'm a task force

18  officer assigned to the FBI in San Antonio.

19  Q.  Okay.  So I should be calling you TFO Granberry?

20  A.  That would work.

21  Q.  Okay.  So, Mr. Granberry, can you tell me how long have you

22  been a TFO?

23  A.  Three years approximately.

24  Q.  And what do you -- what is your -- what do you focus on?

25  A.  We focus on domestic terrorism.

Justin Granberry - Direct

1  Q.  And how do you know -- or I should say, do you know the

2  defendant, Mr. Hauser?

3  A.  Yes.  I am aware of him.

4  Q.  And how did you become aware of him?

5  A.  Through an investigation that was initiated earlier last

6  year, in 2021.

7  Q.  And did that investigation result in an indictment?

8  A.  It did.

9  Q.  And do you know the charges of that indictment?

10  A.  I believe it was felon in possession of a firearm.

11  Q.  And can you summarize briefly how that investigation began?

12  A.  Yeah.  We received -- the FBI received information through

13  sources that Mr. Hauser had made some violent comments or posed

14  a threat.  I'm not aware of the nature of those.  But the

15  investigation was opened.  Through that investigation, it was

16  determined that he was a prohibited person, and it was also

17  determined that he was in possession of firearms.

18  Q.  Do you know specifically, was he a part of or affiliated

19  with any particular groups?

20  A.  Yeah.  We believed him to be a part of the Boogaloo group.

21  Q.  And can you describe for me the Boogaloo group, Boogaloo

22  Bois?

23  A.  It's kind of -- it's an ideology, a movement.  It's

24  antigovernment, antipolice, antigun control, kind of an

25  anarchist extremist group.

Justin Granberry - Direct

1  Q.  And do you recall -- if you -- if you recall, what
2  suggested that the defendant was part of that group?
3  A.  There's certain terminologies.  There's certain attire that
4  is worn.  I don't know the specifics.  I haven't reviewed the
5  case file, and I didn't open the case originally, but it was
6  determined that he was part of this ideology.
7  Q.  And was -- can you describe what you -- what you know about
8  any firearms he possessed?
9  A.  Through the investigation, it was found that he was in
10  possession of an assault rifle.  He was trying to acquire parts
11  to assemble an assault rifle.  We knew he had a pistol, and he
12  was 3D printing parts to build an assault rifle as well.
13  Q.  And you were saying an assault rifle.  Can you -- do you --
14  can you describe that to me?
15  A.  Like an AR-15.
16  Q.  Okay.
17  A.  A platform weapon.
18  Q.  And is that a semiautomatic rifle?
19  A.  They are, yes.
20  Q.  Okay.  And is that -- is that type of rifle common with
21  people in the Boogaloo movement?
22  A.  It is, yes.
23  Q.  Okay.  And you said he was printing parts.  Can you
24  describe any of those parts for me?
25  A.  Some of the parts that we found, that Mr. Hauser was

Justin Granberry - Direct

1  producing, was a suppressor to silence the report of the
2  weapon.  He was printing the lower receiver, which is typically
3  the part that is tracked and controlled by the ATF.  He was
4  printing parts of -- what's called a drop-in auto sear.  If
5  it's dropped into a functioning lower receiver, it can allow a
6  semiautomatic weapon to operate fully automatic.
7  Q.  Let me ask you to just elaborate on a couple of those
8  concepts.
9  A.  Certainly.
10  Q.  You said "silence the report."  What does that mean?
11  A.  So the sound --
12        MS. ROTH:  May I just interrupt for one moment?  We
13  did -- there was a hearing at the 922(g) bond hearing, and this
14  relates to that.  So there was a bond set.  And, in fact,
15  Mr. Hauser was in compliance with that bond.
16      So I don't -- I don't -- I mean, I'm not opposed to
17  learning about the firearms, but I just -- it's irrelevant to
18  today's decision.
19        MR. STEPHENSON:  Your Honor --
20        THE COURT:  There was -- originally, there was a bond
21  hearing, and Judge Bemporad ordered him detained and then, I
22  think upon reconsideration, let him out on some very
23  restrictive conditions.
24      Since I didn't hear all that evidence, I'll hear a little
25  bit of context, because I know this is -- this case involves

Justin Granberry – Direct

1   new information.  And I assume this links up at some point?

2          MR. STEPHENSON:  It does, Your Honor.  And we don't

3   have the transcript of that prior hearing available.  So I feel

4   like the totality of the circumstances are relevant to the

5   detention determination.

6          THE COURT:  So you can proceed.  Thank you.

7          MR. STEPHENSON:  Thank you.

8   BY MR. STEPHENSON:

9   Q.  I was asking you about, what do you mean by something that

10  silences or suppresses the report of a firearm?

11  A.  So the noise that is typically associated with firing a

12  weapon, it would reduce that.  Commonly known as, like, a

13  silencer or suppressor, that's what he was creating --

14  Q.  Okay.

15  A.  -- or printing.

16  Q.  And you said that he was also printing lowers.  Does that

17  relate -- and you said that that was what's tracked.  Does that

18  relate to the concept of a ghost gun?

19  A.  I believe so.  I can't speak with a lot of experience in

20  ghost guns.  But yes, he was creating the lower portion of an

21  AR or assault rifle-style weapon that wouldn't come with a

22  serial number.

23  Q.  And you also mentioned an auto sear.  Describe to me what

24  the purpose of an auto sear is.

25  A.  It would be to allow a semiautomatic weapon to become fully

Justin Granberry – Direct

1  automatic.

2  Q.  And do you know if he ever attempted to use one?

3  A.  We are aware that he did try to use it at one time.

4  Q.  Okay.  I'd like you now to tell me, were you present when

5  Mr. Hauser was arrested for that offense?

6  A.  Yes, I was.

7  Q.  And did you take any evidence into possession at that time?

8  A.  At that time we took some belongings.  He also had a pistol

9  with him and a cellphone.

10  Q.  So he had a firearm in his possession when he was arrested?

11  A.  It wasn't on him.  It was with him.  He was off site.  It

12  was in a bag that he had taken to work.

13  Q.  A bag he had carried with him to work?

14  A.  Yes.

15  Q.  Okay.  And did you take any electronic devices?

16  A.  We took a Samsung cellphone.

17  Q.  Did you subsequently review that cellphone?

18  A.  We did.

19  Q.  And did you find any evidence that he possessed firearms on

20  that cellphone?

21  A.  Yes, we did.

22  Q.  Did you subsequently find any evidence that he possessed

23  child pornography?

24  A.  Yes, we did.

25  Q.  And where was that?

Justin Granberry - Direct

1  A.  It was located within the photos of -- and videos of the

2  cellphone.

3  Q.  And was that -- approximately how long after you made the

4  arrest did you find the child pornography?

5  A.  It was a couple months later that we started the review of

6  that.  And that's when we found them.

7  Q.  Did you personally review those images?

8  A.  I did.  Yes.

9      MR. STEPHENSON:  Okay.  Your Honor, I'm not going to

10  go into details on those.  I believe that those -- described in

11  the indictment.

12      THE COURT:  I'm looking at them now.

13  BY MR. STEPHENSON:

14  Q.  After personally viewing those, did you have any doubt that

15  they were child pornography?

16  A.  I believed them to be child pornography, yes.

17  Q.  Did you seek any other expertise or guidance in evaluating

18  those images?

19  A.  Yes, I did.  Those images, among others, were referred to

20  the FBI's Violent Crimes Against Children Unit.  After their

21  review, the videos and the photos that led to the indictment

22  were flagged by them to be consistent with child pornography.

23  Q.  And are those experts in that field?

24  A.  That's their main job, yes.

25  Q.  Okay.  Did they express any reservations to you about

Justin Granberry – Direct

1  whether or not those images were child pornography?

2  A.  No.

3  Q.  Okay.  Do you happen to know if Mr. Hauser has any children

4  in the home where he's currently located?

5  A.  It's my understanding that he has a young child, a son, I

6  think three or four years old.  And I believe there may be some

7  older stepchildren --

8  Q.  And do you --

9  A.  -- that are minors.

10  Q.  Do you know if he has any child supervision duties?

11  A.  From what I know, I believe that he does take care of his

12  son during the day.

13  Q.  Okay.

14  A.  The young son.

15  Q.  And in -- let me -- let me go back to the -- to the guns

16  that we talked about earlier.  Do you know how, if at all,

17  those were secured in the home?

18  A.  I don't know that they were secured at all.  I wasn't at

19  the search warrant that seized those weapons at the home.  So

20  I'm not sure how they were stored.

21  Q.  Okay.  And we're turning back to the child pornography

22  found on his phone.  In your opinion is somebody who has child

23  pornography on their phone suitable for supervision of

24  children?

25  A.  In my opinion, no.

1    MR. STEPHENSON:  Your Honor, I'll pass the witness.

2    THE COURT:  Okay.  Thank you.

3                    CROSS-EXAMINATION

4  BY MS. ROTH:

5  Q.  You saw no pornographic images of that child on the phone,

6  correct?

7  A.  No, ma'am, not of that child.

8  Q.  And you're aware that Mr. Hauser, while he was on bond,

9  just right until this arrest, had no bond violations, correct?

10 A.  Correct.

11 Q.  The cellphone that you've been talking about was seized on

12 the same day as the firearms, correct?

13 A.  Yes, it was.

14 Q.  So it's all part of that same arrest?

15 A.  Yes.

16 Q.  You were present or not present at the time of the arrest?

17 A.  I was present at the time of the arrest, yes.

18 Q.  Regarding the firearms, the suppressor that you talked

19 about was not functional, correct?

20 A.  It wasn't determined if it was functional or not.  It was

21 just seized.

22 Q.  So no one examined it, you mean, or --

23 A.  I don't have that information.  It was sent to an FBI lab

24 for analysis, but I don't have their report.

25 Q.  I see.  That was last year?

Justin Granberry - Cross

1   A.   The report came out, I believe, last month.

2   Q.   Oh, so the report came back, and the report said,

3   undetermined?

4   A.   I don't know what the report says.

5   Q.   So you don't know for sure that -- you don't have

6   independent confirmation that the suppressor was nonfunctional?

7   Is that what you're saying?

8   A.   Correct.   I don't know if it worked or not.

9   Q.   Okay.   And then you talked about -- on direct about an

10  allegation that Mr. Hauser tried to use the sear.   Any use of

11  the sear was unsuccessful, correct?

12  A.   Correct.   When Mr. Hauser did it.

13  Q.   You also talked about assault weapons or assault rifles

14  being typical of the Boogaloo Bois group.   But, actually,

15  assault rifles are one of the most purchased firearms by any

16  group or any person, that's not affiliated with a group,

17  currently in the United States, correct?

18  A.   I'm not aware of that.

19  Q.   Have you ever been a part of seizing an assault rifle?

20  A.   Yes.   There's assault rifles everywhere, and they may be

21  associated with other groups.   But specifically the Boogaloo

22  group, they are also typical.

23  Q.   "Also typical"?

24  A.   Of the Boogaloo group.   So they may be typical for other

25  groups as well, but for the --

1  Q.  And individuals who aren't part of the group?

2  A.  Correct.

3  Q.  What percentage of the sales of firearms in the

4  United States are currently assault rifles?

5  A.  I don't have that information.

6  Q.  Have you been to a gun store lately?

7  A.  I have not.

8          MS. ROTH:  Thank you, Your Honor.

9          MR. STEPHENSON:  Your Honor, I'll be very brief.

10                    REDIRECT EXAMINATION

11 BY MR. STEPHENSON:

12 Q.  Do you happen to remember any of the defendant's online

13 handles that he used?

14 A.  I know one was Kangaroonicorn.

15 Q.  Is that indicative of a Boogaloo Boi-type handle?

16 A.  Yes.  Usually kind of off-the-wall stuff.

17          THE COURT:  What was -- what was it?

18          THE WITNESS:  Kangaroonicorn.

19 BY MR. STEPHENSON:

20 Q.  And do you -- let me ask.  You mentioned earlier that you

21 were not the original case agent on this.  When did you take

22 over?

23 A.  I took over around October/November timeframe.

24 Q.  Okay.  And --

25 A.  Of last year.  I'm sorry.  2021.

Justin Granberry - Redirect

1  Q.  And in preparation for this hearing today, were you able to

2  review your notes and files?

3  A.  No, I was not.

4  Q.  About how much time did you have to prepare?

5  A.  Ten minutes.

6         MR. STEPHENSON:  Okay.  Thank you, Your Honor.

7  Nothing more for this witness.

8         THE COURT:  All right.  He can -- you can --

9         THE WITNESS:  Okay.

10        THE COURT:  Ms. Roth, you have something else to

11  follow up on?

12        MS. ROTH:  I have a witness, Your Honor.

13        THE COURT:  Okay.

14        MR. STEPHENSON:  Your Honor, may I -- I think -- I'd

15  like to be able to argue as to the PSR at some point.  Do we

16  need to bring that in, or can we proffer from it?

17        THE COURT:  Oh, I take judicial notice of the pretrial

18  services report.

19     Do you have any other evidence before I turn it over?

20        MR. STEPHENSON:  No, Your Honor.  Thank you.

21        THE COURT:  All right.  Go ahead.

22        MS. ROTH:  Thank you.  I call Deena Hauser Lancaster

23  to the stand.

24        THE CLERK:  Please raise your right hand.

25     *(The oath was administered)*

Deena Hauser Lancaster – Direct

1    DEENA HAUSER LANCASTER, DEFENDANT'S WITNESS, SWORN

2    DIRECT EXAMINATION

3    BY MS. ROTH:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   Could you tell the Court and those present your name,

7    please.

8    A.   Deena Ann Hauser Lancaster.

9    Q.   Are you related to Mark Hauser?

10   A.   He is my son.

11   Q.   And who is in the courtroom with you today?

12   A.   My mother, Sheila Christine Norgard, and my husband,

13   Gregory Coe Lancaster.

14   Q.   Are you and your husband retired, working right now?

15   A.   We're retired.

16   Q.   And what are you both retired from?

17   A.   Well, myself, I was an oil and gas accountant for

18   Halliburton for quite a while, and I went back to school and

19   became a teacher on a NASA grant.  I got my master's in special

20   ed and special behaviors.  And I've almost finished my Ph.D.

21   Q.   Congratulations.

22   A.   Thank you.

23   Q.   And your husband, he is retired from?

24   A.   Well, he retired from Bell Helicopter.  He retired from the

25   government and -- he was the IT director for Harris County.

Deena Hauser Lancaster - Direct

1   And he retired from a little job he was working, Reese Group.

2   It was a grocery warehouse -- I'm not really sure -- retailer.

3   Yeah.  And he, for over 30 years, was a music minister at

4   church.

5   Q.  Did you talk to United States Pretrial Services about the

6   possibility of Mark Hauser moving from the house with his wife

7   and child to your home?

8   A.  Yes, we did.

9   Q.  And are you willing to have him reside at your home if he's

10  placed on bond?

11  A.  Absolutely.

12  Q.  Why?

13  A.  Because he's my son.

14  Q.  Do you think he's going to comply with bond?

15  A.  Oh, I know he will.

16  Q.  Were you aware that he was on bond when he was living with

17  Melissa and her son and their son?

18  A.  Absolutely.  He -- I took him to practically all his

19  appointments, medical appointments and all the other

20  appointments.  And he had the ankle bracelet on, and he was

21  very, very cautious not to go beyond the edge of the door, the

22  front door or the back door.  He was very concerned about his

23  boundaries.

24      He was always nervous about not -- if he was allowed to

25  leave for an appointment at 9:00 in the morning, he wanted to

Deena Hauser Lancaster - Direct

1  make sure he didn't walk out the door until a few minutes after

2  9:00.  We were always rushing to get back.  He was always

3  concerned about meeting the constraints.

4      And there were times that we had to call Officer Perez and

5  leave him messages, hey, remember, I've got an appointment

6  today, because he was often forgetting that he had

7  appointments.

8      So yeah, I feel that he will follow all the rules.

9      I'm sorry.  I'm not used to talking like this.

10  Q.  That's very understandable.

11      Do you agree with the government witness's statement that

12  your son was in compliance with his bond conditions?

13  A.  That he was in compliance?

14  Q.  Uh-huh.

15  A.  Yes.

16  Q.  Do you have any reason to believe that he would not

17  continue to be in compliance with bond if rereleased?

18  A.  I have no doubt.

19  Q.  In the pretrial services report it talks about some

20  firearms at your home and also the Wi-Fi at your home.  Did you

21  talk to U.S. Pretrial Services about that, you and your

22  husband?

23  A.  Officer Perez came to our home and was there for a while,

24  and then he called back, and we had a long conversation over

25  the phone.  And yes, we spoke to him about that.

Deena Hauser Lancaster – Direct

1      With regard to the firearms, most of our firearms are
2  inherited.  And they're so old, they probably are inoperable.
3  But we did tell him that we were willing to buy a high-end safe
4  and that we would also put it inside of a closet with a
5  deadbolt.  And our handguns have locks on them already.  So
6  that's -- he said that that would be sufficient.
7      And with regards to the Wi-Fi, we just have our laptops,
8  our Roku TV and our phones, that are like -- I don't know how
9  you consider it.  I don't know the technology.  But anyway,
10  other than that, we do all of our banking, all -- everything.
11  We usually have our groceries delivered.  We do everything
12  online.  Our electronics in the home, like the washer and dryer
13  and our Roomba and the bed I sleep in, because we both have
14  back surgeries, it has to use the Wi-Fi.  I mean, there's just
15  so many things that have to use the Wi-Fi to operate the things
16  in our lives and to help us live our lives.
17      But we spent hours sitting in front of the Roku, going
18  through and putting parental locks on every single app that's
19  on the TV.  And if we couldn't get it to work out with the
20  parental lockdown, whatever you call it, we disabled it.  So --
21  Q.  You mean -- you mean you did all this after talking to
22  United States Pretrial Services?
23  A.  Yes, ma'am.
24  Q.  Okay.  And so you need Wi-Fi to operate your bed and your
25  home items, like the Roomba machine and things like that, and

Deena Hauser Lancaster – Direct

 1  your washer and dryer, you've said?

 2  A.  And the Ring button and --

 3  Q.  The Ring button?

 4  A.  And I misunderstood what you said.  You asked me if I -- if

 5  we did that after we spoke to him.  We did that after he called

 6  us and made the appointment to come over, so we had it done

 7  when he came to the house, so that we could show him that we

 8  had it on lockdown.

 9  Q.  Okay.  Thank you.

10     And you're willing to -- well, first of all, how many

11  devices that are -- that can potentially link to the

12  internet -- so, for instance, the Roomba can't link to the

13  internet.  But how many devices do you have in your home that

14  can link to the internet, as far as being able to search the

15  internet?

16  A.  Oh, just our phones and our laptops and the television.

17  And they're usually with us.  Since we're retired and disabled,

18  we're kind of couch potatoes.

19  Q.  Do you stay at home most of the day?

20  A.  Yes, ma'am.  The only time I leave is when I go to a doctor

21  or pick up Mark to take him to his appointments to go and

22  prepare for his heart surgery.

23  Q.  Do you -- how many laptops and how many phones and how many

24  TVs do you have?

25  A.  We have the Roku TV in the living room.  We both have a

Deena Hauser Lancaster – Direct

1   iPhone, and we both have laptops.  And then there's a really
2   old TV in the bedroom, but I am not sure -- no.  It doesn't.
3   He's shaking his head no.
4   Q.  Who?
5   A.  My IT director.  My husband.
6   Q.  Your husband.  So your husband's indicating to you right
7   now that, no, that cannot -- that other TV cannot connect to
8   the internet?
9   A.  Correct.
10  Q.  Okay.  And I'll just caution you that you need to be
11  answering this and that -- it's okay.  I --
12  A.  I won't look at him.
13  Q.  That's okay.
14      But your husband has at least 15 years of IT background,
15  correct?
16  A.  Yes, ma'am.
17  Q.  So he's able to understand the pretrial services'
18  instructions on restriction of access to internet?
19  A.  Yes, ma'am.  He had to take about 20 minutes to explain to
20  Officer Perez how they actually worked and what was going on
21  when we had to lock down, because Officer Perez said he doesn't
22  have any internet or anything like that at his home.  So my
23  husband had to show him how it was working and how we knew that
24  it was locked down.
25  Q.  Okay.  And are you willing to password protect those five

Deena Hauser Lancaster - Direct

1  devices with internet connectivity and not share those
2  passwords with your son, Mark?
3  A.  Yes, ma'am.  We've already changed everything and put it to
4  where you can't even guess them.  And they are double
5  blocked -- double password protected.
6  Q.  Okay.  If pretrial services also wanted to put software
7  monitoring devices on to make sure there wasn't any
8  unauthorized access to the internet, would you be willing to do
9  that?
10 A.  I don't see why not.
11 Q.  You talked about taking your son to the appointments with
12 pretrial but also to medical appointments.
13 A.  Yes, ma'am.
14 Q.  Tell us about what medical appointments you were taking him
15 to and why.
16 A.  In 2014 Mark -- his mitral valve ruptured, and he had to
17 receive a porcine valve at that time.  But the flesh around it
18 was so poor, that in March of 2015 it was coming unsewn.  And
19 so he had to -- they had to go in, and he had another
20 open-heart surgery.
21     And he has a wire -- you know, they wire the sternum
22 together.  And that wire is coming out.  And right now it's
23 poking out, and it's been painful for him.  So when he went to
24 the doctor for them to look at that, they found that he -- and
25 they did a lot of tests.  He needs to have a new valve.  And

Deena Hauser Lancaster - Direct

1  this time, they want to put a mechanical mitral valve in, since

2  he has trouble with the porcine.  So -- and in order to do

3  that, he has to have a lot of dental surgery done because the

4  infection has gotten up in his gums and teeth.

5  Q.  Is anything currently scheduled?

6  A.  Yes, ma'am.  He -- they scheduled and had to postpone his

7  actual surgery because the hospital couldn't get the drugs in

8  that they need to use for him.  And then, it was either

9  Thursday or Friday, I had a call that they were ready for him

10 to come in for his preop again and to schedule him for the

11 surgery -- to come up -- they had wanted to do it next week.

12 And he has his dental clearance -- his second appointment for

13 that for next week.

14 Q.  Okay.  So if I understood you, did you mean that he missed

15 a preop because he was arrested?

16 A.  Yes, ma'am.

17 Q.  Is that rescheduled yet?

18 A.  It's pending on what happens here today.

19 Q.  Okay.  And then the dental appointment, which is also part

20 of the preop process, is scheduled for next week?

21 A.  It's for Tuesday, I believe.

22 Q.  Your son has insurance?  Medical insurance?

23 A.  He does have dental insurance through Melissa's job, and I

24 was going to pay the copay.

25 Q.  Is he also on Carelink?

Deena Hauser Lancaster – Cross

```
 1  A.  Yes, ma'am.
 2          MS. ROTH:  Pass the witness.
 3                     CROSS-EXAMINATION
 4  BY MR. STEPHENSON:
 5  Q.  Good afternoon, Ms. Lancaster.
 6  A.  Good afternoon.
 7  Q.  Are you aware that your son is a felon?
 8  A.  Yes.
 9  Q.  Can you describe what he was convicted of?
10  A.  "Convicted of"?
11  Q.  Yeah.  Why is he a felon?
12  A.  Back -- I don't even know the year.  But he was using
13  heroin.
14  Q.  So it's related to drug possession?
15  A.  Yes.
16  Q.  Okay.  Any other felony convictions or charges that you're
17  aware of?
18  A.  I think all of it is related to the craziness that goes
19  through a person when they're on drugs.
20  Q.  Are you aware of any forgery charges against him?
21  A.  Forgery.  Maybe we're using different terminology.  No.
22  I'm not aware that that was something that he was convicted of,
23  no.
24  Q.  Are you aware -- or when did you -- when did you become
25  aware that he was a felon?  Approximate.  Just give me a year.
```

Deena Hauser Lancaster – Cross

1  A.  Give you a year?

2  Q.  Yeah.

3  A.  Sir, he's a -- he's a felon because he went to jail.  I

4  don't know what you mean by -- okay.  This has to do with the

5  current charges of today, why?

6  Q.  Are you aware he was a felon before he was arrested for

7  the -- for the felon in possession charge?

8  A.  Yes.

9  Q.  Okay.  Did you know that he had firearms?

10  A.  Yes.

11  Q.  When did you first know that he had firearms?

12  A.  I guess 2021, I think.

13  Q.  Not before then?

14  A.  I don't remember.

15  Q.  Were you aware that he had firearms before he was arrested

16  for felon in possession of a firearm?

17  A.  Yes.

18  Q.  Okay.

19  A.  I just answered that, sir.

20  Q.  Did you ever help him to acquire a firearm?

21  A.  I purchased a part of a firearm that I thought was going to

22  be used for myself.  And I see now that was poor judgment.

23  Q.  Did you know what you were purchasing was a part of a

24  firearm?

25  A.  Okay.  It came from a firearm manufacture gun store online.

Deena Hauser Lancaster – Cross

1  It was shipped to a gun store.  I went into a gun store to pick

2  it up.  So I would say, cognitively speaking, yes, I was aware

3  that I was in a gun store picking up a part of a gun.

4  Q.  And did he -- did he ask you to go pick it up for him?

5  A.  Yes.

6  Q.  Okay.  And did you --

7  A.  But I wasn't picking it up for him.  I've already told you,

8  it was for something for me, that he was going to help me to

9  do.

10  Q.  So you were going to pick it up and give it to him?

11  A.  No.  He was going to come to my house and put it together

12  for me.

13  Q.  So he was going to take it from you?

14  A.  He was not going to take it from me.  He -- I have a living

15  room and a kitchen.

16  Q.  Okay.

17  A.  And we were going to sit there together and put it

18  together.

19     You're trying to misconstrue what I'm trying to tell you.

20  Q.  I'm trying to understand how you were going to get this

21  firearm, this piece of a firearm --

22  A.  Okay.

23  Q.  -- and get it made into a firearm.  Who was going to do

24  that for you?

25  A.  Okay.  I will try to tell you in a way that you might

Deena Hauser Lancaster – Cross

1    understand, like I'm talking to one of my students.  It arrived

2    in my name.  I went to the store, picked it up, took it home.

3    He came over, and he -- we were working with my guns to put it

4    together on my firearm.

5        Again, I ask you, why is this so important, that it has to

6    be broken down so primarily?

7                THE COURT:  You know, actually --

8                MR. STEPHENSON:  Your Honor --

9                THE COURT:  -- he asks you the questions.  You answer

10   the questions.

11               THE WITNESS:  Okay.

12               MR. STEPHENSON:  Your Honor, I'd like to make the

13   witness aware of her Fifth Amendment rights to not make

14   self-incriminating statements.

15   BY MR. STEPHENSON:

16   Q.  Are you aware that you have Fifth Amendment rights to not

17   incriminate yourself?

18   A.  Yes.

19   Q.  Okay.

20   A.  I wasn't aware I was.  Thank you.

21   Q.  Okay.  Knowing those rights, I'm going to continue to

22   answer -- to ask you questions.

23               MS. ROTH:  Your Honor, this is actually outside of

24   what the prosecutor is able to do.  He cannot knowingly cause

25   someone to incriminate his or herself.  If that's what his

Deena Hauser Lancaster – Cross

1  intent is and which is what he's just stated, then I ask that
2  you appoint counsel to represent this witness.
3          MR. STEPHENSON:  Your Honor, part of the argument she
4  was making is that this would be an adequate and good
5  caregiver, somewhere that -- where he could stay.
6          THE COURT:  Right.  I think -- so I think we can -- we
7  can get to that.  And I think that you already have made the
8  point that you were attempting to make, without causing her to
9  testify further on these facts that might require her to have
10  her own attorney.
11          MR. STEPHENSON:  Okay.  Thank you, Your Honor.
12  BY MR. STEPHENSON:
13  Q.  Are you aware that your son had a cellphone?
14  A.  Yes.  My son had a cellphone.
15  Q.  Were you aware that he had images on his phone?
16  A.  No.
17  Q.  Were you aware that he had child pornography on his phone?
18  A.  No.
19  Q.  Have you read the indictment charging him with child
20  pornography?
21  A.  No.
22  Q.  Okay.  Would it surprise you that he had those images on
23  his phone?
24  A.  Yes.
25  Q.  Okay.  Are you aware that child pornography images are

1  often obtained online?

2  A.  I assume so.

3  Q.  And in your opinion, if someone has child pornography on

4  their phone, are they a good caregiver for children?

5         MS. ROTH:  Your Honor, that is absolutely a harassing

6  question of this witness, and it's beyond any purpose or scope

7  of this hearing.

8         MR. STEPHENSON:  We'll withdraw it.

9         THE COURT:  Okay.

10         MR. STEPHENSON:  Your Honor, I'll pass.

11                    REDIRECT EXAMINATION

12  BY MS. ROTH:

13  Q.  Both United States Pretrial Services and I and your son

14  told you what this indictment is; that it's —— that it's an

15  accusation that he possessed child pornography, correct?

16  A.  Correct.

17  Q.  On his phone, correct?

18  A.  Correct.

19  Q.  Are you willing to have every firearm or firearm-related

20  thing in your house locked inside of a safe, locked inside of a

21  closet with a deadbolt?

22  A.  Yes, ma'am.

23  Q.  Are you willing to do that within the next twelve hours, if

24  this Court sets your son on conditions of release?

25  A.  Yes, ma'am.

1  Q.  If the Court orders you to do that within the next two
2  hours, will you do it?
3  A.  Yes, ma'am.  We've already decided to -- we've already
4  located what we want and what we need.  And we were going to
5  pick it up on the way home.
6        MR. STEPHENSON:  Nothing further for this witness,
7  Your Honor.
8        THE COURT:  You may step down.
9     Any other witnesses, Ms. Roth?
10        MS. ROTH:  No, Your Honor.
11        THE COURT:  All right.  I'll hear argument.  And I do
12  have the pretrial services report.  I also have in front of me
13  the bond conditions that Judge Bemporad imposed in November of
14  2021.  They are quite restrictive bond conditions.  They
15  involve home detention.  There was also requirement that the
16  defendant not possess any computers and that folks living in
17  his house consent to pretrial confirming that they have
18  everything protected.  So those were -- and no posting on
19  social media.  Those were all restrictions placed on him prior
20  to -- I don't think anything about child pornography was
21  introduced at the last detention hearing, I assume.
22        MR. STEPHENSON:  That's correct, Your Honor.
23        THE COURT:  So he was already on restricted behavior
24  related to other activity he was engaging in online and with
25  computers.  And so I have all that information.

1     And given all of that, I'll hear argument on your position

2  on, you know, for you, Mr. Stephenson, whether or not these

3  conditions are sufficient under the Adam Walsh Act.  Given the

4  charges, we have additional concerns that we have to address,

5  that the pretrial services report addresses -- so whether or

6  not there is anything, you know, additional.  I don't know that

7  there is, given the options for where folks can live.  And I'll

8  have Ms. Roth respond to that as well.

9     But we're not starting, as we usually do, from a blank

10 slate.  We're starting from this slate.  So I just want

11 argument to start from there.

12          MR. STEPHENSON:  Thank you, Your Honor.

13    Your Honor, I don't believe that there are additional

14 conditions that can ensure the safety of the community.  He has

15 restricted conditions placed upon him now.  However, he's

16 charged with two very serious felonies, one involving use -- or

17 possession of a firearm, and it involves an affiliation with a

18 violent, dangerous group.  The other charge is one of child

19 pornography, possessing child pornography.

20    I believe that, given those -- both the violence and the

21 inherent danger to children, of somebody who possesses child

22 pornography -- obviously, there are child victims related to

23 the offense of possession of child pornography -- that the

24 danger to the community is just too great and that no further

25 conditions will allow that.

1    I don't believe that the conditions of -- requesting that

2  his parents secure the firearms are sufficient.  I believe

3  we've elicited evidence that his mother, at the time that she

4  knew he was a felon, helped him to possess and obtain materials

5  for a firearm.  I don't believe, in that scenario, that that

6  same person, who helped him previously to possess a firearm,

7  knowing that he was a felon, could also be trusted to restrict

8  his access to additional firearms, which they admit are in the

9  house, or to prevent him from accessing the internet.  I don't

10  think that we can trust her assurances, given the past.

11    I would submit, also, that the dangers are sufficiently

12  high, that they outweigh any of these restrictions, given that

13  we know his -- we can't send him back to the house where he was

14  at.  The pretrial services report substantiates that he

15  shouldn't be in a house with children.  Even as -- even though

16  we know that these images were not of those children, it's just

17  too great a risk to put somebody who has child pornography on

18  their phone in a place where they supervise children.

19    Putting him in the house with his parents, particularly

20  with his mother, who we know has previously helped him to

21  obtain firearms even when she knew that he was not authorized

22  to do so, I don't believe we can, therefore, trust her to keep

23  him away from firearms and to keep him offline and abide by his

24  bond conditions.

25          THE COURT:  Okay.  Ms. Roth.

1        MS. ROTH:  Thank you, Your Honor.  Starting from what
2    we know is this fact, that Mr. Hauser did not violate any bond
3    conditions whatsoever.  This arrest even -- including even this
4    arrest, because the phone was seized --
5        THE COURT:  No.  I understand.  The phone was seized
6    at the time of the original arrest, and the images were
7    discovered later.  I mean, he has not violated, that we know
8    of, any of the previously-imposed conditions.  He has been out
9    a few months.  Those are good facts in your favor.
10       Now we're here in a different posture, though.  We already
11   had troubling behavior online, that led to the other judge
12   imposing some of the more restrictive conditions I've seen
13   imposed in a non-child porn case, for computer usage.  And so
14   the discovery that he also was in possession of child sex abuse
15   material is, you know, a different and troubling discovery, one
16   that triggers a new set of things that pretrial usually
17   recommends that we need to do, including not having a house
18   with kids and including having him very protected from access
19   to the internet.
20       His parents have internet in their house, for
21   understandable reasons.  All the reasons offered for wanting to
22   have internet completely make sense.  But we have a very
23   technologically-sophisticated defendant and father.  And, you
24   know -- and pretrial can only do so much to ensure that there
25   isn't access in that environment.

1      So how should I respond to that?

2           MS. ROTH:  Well, there's no -- I see no record or

3   heard no record of internet sophistication on Mark Hauser's

4   part.  But the --

5           THE COURT:  I thought the report said he was an eight

6   out of ten.  Is that what the pretrial report said?

7   Technology --

8           MS. ROTH:  What is an eight out of ten?  I'm sorry.

9           THE COURT:  In technological knowhow.  I may have --

10  yes.  Defendant's estimated to have the technological knowledge

11  rated eight out of ten, on the first page of the pretrial

12  report.

13          MS. ROTH:  I'm sorry.  I don't know what that means or

14  even -- I can't -- on the first page?

15          THE COURT:  It's in the bold, under the introduction

16  section, the last sentence.

17          MS. ROTH:  Agent Granberry?

18          THE COURT:  Yes.

19          MS. ROTH:  I don't know what that means.  So I'm

20  sorry.  I don't know how to address that.

21      But I do know that the IT background of Mr. Hauser's

22  stepfather would be an asset to pretrial, especially if he was

23  named as a custodian, because he can assist in making sure that

24  there's no internet accessibility.

25      I don't know of a case where a court has ordered that no

1    Wi-Fi is allowed in the house -- in any house.  But there are

2    certainly ways to restrict and control internet access.  And

3    the parents have already done that by double pass protecting

4    their five devices and making sure that Mr. Hauser doesn't know

5    what those double passwords are.

6        He can't -- Mr. Hauser could not -- no matter how

7    sophisticated an individual is technologically, they can't

8    access the internet through a Roomba vacuum machine.  So the

9    five devices are their two personal laptops, their two personal

10   phones and a Roku smart TV -- one Roku smart TV.

11       The mother testified that they went through the Roku device

12   and, on every single one, put parental controls.  And if they

13   weren't able to put parental controls, then they would disable

14   the app.

15       She also testified that she'd be willing to have software

16   monitoring put on their electronic devices.

17       Moving to a new house where pretrial already confirmed

18   there are no child devices or toys and where the information

19   from the family is that children don't frequent that house,

20   takes care of any concern you might have regarding that

21   residence.  Pretrial already confirmed that the residence is

22   not in proximity of child safety zone areas.  They confirmed

23   that with the aerial Google search.

24       And the parents have already selected a safe.  I don't

25   think we can fault them for not purchasing a safe yet, when

they don't know if their son's going to be released on bond or not.  I don't think that can be faulted since those are several thousand dollars, at minimum.  But they are willing to purchase a safe upon leaving this room, put it inside a closet and put a deadbolt on that closet door.

I did not discuss with them the possibility of putting it in a safe and taking it to a friend's house or a cousin's house.  I don't know if they'd be willing to do that or not just simply because I didn't ask.  But that is some -- that is another measure that could be taken.  I don't know that that offers any additional safety.

But Mr. Hauser is already, as you noted, on extremely restrictive conditions.  Often, when people are on those restrictive conditions, they're unable to comply.  That wasn't him.  He complied with everything.  And he reported his medical needs in advance, and he would need to keep doing that.

So the surgery would require hospitalization, of course. So he wouldn't be at home at all during that time period.

But his best statement to you is the way that he complied with the restrictive conditions that Judge Bemporad set and imposed on him.  And none of this conduct happened, of course, during that time.

The government did know, as soon as they looked at that phone, what was on there.  But because of their processes, it takes them longer to be able to come back with a charge.  And I

1  understand that.

2          THE COURT:  I don't know that there's anything in the

3  record that they knew that there was child pornography on the

4  phone at the time of the previous hearings.

5          MS. ROTH:  Well, that's true.  It's probably not on

6  the record because it was just something that the government

7  counsel and I talked about but --

8          MR. STEPHENSON:  Your Honor, that's not correct.

9  There is -- the government was not aware that there was child

10  porn at the time we had the prior bond hearing or at the time

11  that we indicted him for felon in possession.

12          THE COURT:  And I am confident that child pornography

13  was not presented to Judge Bemporad as something to consider in

14  crafting conditions --

15          MR. STEPHENSON:  Your Honor, the government didn't

16  know about it.  We couldn't present it.

17          MS. ROTH:  The government knew about it for several

18  months, at minimum.  And I hope that the U.S. Attorney confirms

19  that with you.  So maybe I misunderstood him since I wasn't,

20  you know --

21          MR. STEPHENSON:  Your Honor, I'm happy to address

22  that.  The government has been aware that there was -- that

23  there were images suggesting child pornography on his phone.

24  It takes the government several months, unfortunately, to

25  diagnose those images, confirm that they are child pornography

1 and then get that in front of a grand jury.

2        MS. ROTH:  And I'm not criticizing at this juncture

3 the fact that it takes those months.  What I'm trying to point

4 out is that, all during this time, Mr. Hauser has not engaged

5 in any of that conduct and has been successfully abiding by all

6 of the restrictive bond conditions.  So what -- so it's not new

7 conduct.

8      So what can be further done?  Moving him to a house where

9 there's no interaction with children, which he's willing and

10 his parents are willing to do, and further lock down his

11 internet accessibility.  It was already virtually locked down,

12 I'm understanding, from the prior conditions.  But this

13 requires even more.  And his family -- he and his family are

14 all willing to abide by that.

15        MR. STEPHENSON:  Your Honor, may I offer just a very

16 brief rebuttal?

17        THE COURT:  Yeah.  Go ahead.

18        MR. STEPHENSON:  Your Honor, the primary issue is that

19 I do not believe he can be trusted at his -- at the new

20 accommodations that defense counsel is advocating for.  I don't

21 believe that we can trust his mother or his family to add the

22 extra protections that are being described, given what we know

23 about his mother's past, with providing him with parts of a

24 firearm to create a firearm for her.

25        MS. ROTH:  I guess I don't understand that.  Because

1  the testimony was -- maybe the government doesn't like that a

2  witness stands up to their questioning.  You know, that's

3  possible, since they rarely get that.  But she testified

4  trustfully.  She answered his questions.  And the answer was

5  that she knew he had a felony in 2021.  Well, that's the same

6  time that he was charged.

7      And the -- she also knew that the felony that he had, which

8  is the only felony, was the possession of heroin, which was

9  many years ago.

10      Texas law and federal law are different on when a person

11  can touch a part of a firearm.  The government did badger the

12  witness, and that's understandable from their point of view.

13  However, there's no indication that she knew he couldn't help

14  her build a firearm.

15      THE COURT:  Okay.  Mr. Hauser, you've been through

16  this before.  So you know what the rules are and how they work.

17  But there are two main things that I consider in deciding

18  whether or not to give you a bond.  One is your risk of -- that

19  you won't appear for court, and the other is the risk of

20  whether you pose a danger.

21      And no one's arguing that you're posing a risk of

22  nonappearance in this case.  And, really, this is all coming

23  down to dangerousness.

24      I did look at the docket in the other case and saw that

25  Judge Bemporad originally did order you detained and find that

1  you were -- and on dangerousness grounds.

2      After a rehearing, that we don't have the transcript of,

3  but, again, before any information about child pornography was

4  at issue, he imposed some very stringent conditions.  As far as

5  I am aware, you've been compliant with those conditions.

6      But the new information means we have to consider new

7  risks.  We are already in a situation where we're considering

8  very high risks.  Those types of conditions are not imposed

9  very often.

10      The proffered solution is to have you go live with your

11  parents instead of at your home with your child and wife,

12  understandably.  But, you know, the two attorneys have

13  different interpretations of the testimony that I -- that we

14  just listened to.

15      What I heard and understood was someone who was willing to

16  do an awful lot for her son, some of it what the Court would

17  ask and some of it not.  And I'm not comfortable, based on the

18  testimony and, frankly, the contemptuous tone that was taken,

19  including with me, that she would be an appropriate custodian

20  to help enforce the Court's rules and restrictions if she was

21  not in agreement with them.

22      For that reason -- that's one of the hardest jobs of being

23  a custodian.  This isn't -- that's not a condition that's going

24  to ameliorate the dangerousness concerns that we have in this

25  case.  And I order you detained.

```
1   * * *

2       (12:12 p.m.)

3

4

5

6                          -oOo-

7       I, court approved transcriber, certify that the foregoing

8   is a correct transcript from the electronic sound recording of

9   the proceedings in the above-entitled matter.

10

11  Date:   6/22/2022      /s/ Chris Poage
                           Approved Transcriber
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```